IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| J D BENEFITS, INC AND<br>J DAVID BATCHELOR,<br><br>Plaintiffs,<br>v<br><br>HARRINGTON WEALTH<br>MANAGEMENT, INC., d/b/a<br>HARRINGTON WEALTH<br>MANAGEMENT COMPANY,<br><br>Defendant | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | 1 04CV01 |

**ORDER AND RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE**

This matter is before the court on a motion for judgment on the pleadings by Defendant Harrington Wealth Management, Inc pursuant to Rule 12(c) of the Federal Rules of Civil Procedure [docket no 39] and on an amended motion by Defendant [docket no 42] for reconsideration of Defendant's prior motion for an extension of deadlines Since there has been no consent, the court must deal with the motion for judgment on the pleadings by way of a recommended disposition The parties have responded to the motions, and the matter is ripe for disposition

**PROCEDURAL BACKGROUND**

On November 21, 2003, Plaintiffs J D. Benefits, Inc and J David Batchelor filed a Complaint against Defendant Harrington Wealth Management, Inc in Orange

-1-

County Superior Court Defendant removed the case to this court based on diversity jurisdiction See 28 U.S.C § 1332. Defendant moved to dismissed pursuant to Rule 12(b)(6) and Rule 12(b)(1), and this motion has been denied [1] Defendant has now filed a motion for judgment on the pleadings as to Plaintiffs' claims for promissory estoppel and indemnification.

## FACTS

In this lawsuit, Plaintiffs seek to recover from Defendant for alleged services rendered by Plaintiffs while acting as Defendant's agents in providing trustee services for employee benefit plans The following facts are taken as true for the purpose of Defendant's motion for judgment on the pleadings·

Plaintiff J D Benefits, Inc ("JDB") is a North Carolina corporation with its office and principal place of business in Chapel Hill, North Carolina. First Am Compl. ¶ 1. JDB provides record-keeping and related services as a third-party administrator (TPA) for defined contribution (a/k/a 401(k)) plans established by small private employers and for special pay (a/k/a 401(a) and 403(b)) plans established by educational institutions or entities. First Am. Compl ¶ 1 Plaintiff J David Batchelor ("Batchelor") is a citizen and resident of Orange County, North Carolina Batchelor is the owner and manager of JDB. First Am. Compl. ¶ 2 Defendant Harrington Wealth Management Company ("Harrington Wealth") is an out-of-state

---

[1] The Rule 12(b)(6) motion was denied as moot because Plaintiffs had subsequently filed an amended complaint

corporation with its principal office in Indiana First Am. Compl. ¶ 3 Harrington Wealth provides investment and trust services as an independent, fee-based financial planner, investment manager, and institutional trustee. First Am Compl ¶ 3 At all relevant times, Richard Harrison has been the President and Chief Operating Officer of Harrington Wealth First Am Compl ¶ 4.

By at least 2000, JDB had become familiar with the services offered by Harrington Wealth, and Harrington Wealth had become familiar with the services JDB provided as a TPA, including JDB's systems and procedures. Based on JDB's recommendation, many of JDB's clients appointed Harrington Wealth as the trustee of plans established in consultation with JDB First Am Compl ¶ 9. As to each plan for which Harrington Wealth acted as trustee, Harrington Wealth appointed Plaintiffs to perform various record-keeping and other trustee functions as Harrington Wealth's agents, thus limiting Harrington Wealth's direct role to supervision, monitoring, and auditing plan compliance First Am Compl ¶ 10

The EMPO-related Plans

About 70 of the plans that JDB serviced as an agent of Harrington Wealth were established by employees served by EMPO Corporation ("EMPO"), a Minnesota entity. EMPO is a "Professional Employee Organization," or a "PEO" First Am Compl ¶¶ 11, 13. EMPO provides services to small, Minnesota-based employers by contractually assuming the employers' rights, responsibilities, and risks vis-a-vis their employees First Am. Compl ¶ 11 In or about 2000, EMPO asked

-3-

JDB to design defined-contribution plans for each of EMPO's employer-clients First Am Compl ¶ 11 As to each of more than 70 of EMPO's PEO clients, upon JDB's recommendation, each employer designated Harrington Wealth as plan trustee First Am. Compl. ¶ 11. As to each of these EMPO-related plans, the employer-sponsor designated JDB to provide administrative services as a TPA, and Harrington Wealth appointed JDB and Batchelor as agents and representatives of the trustee to carry out various record-keeping and all other day-to-day functions of the trustee with respect to the plan First Am Compl ¶ 13 In or about September 2002, the parties confirmed Harrington Wealth's appointment of Plaintiffs as agents and representatives of the plan trustee of, among others, all plans established by EMPO's PEO clients. The agency agreement provides as follows:

> This is to describe that J. David Batchelor and J D Benefits, Inc. has our permission to act as an agent of the plan Trustee in performing administrative functions, fund transfers, distributions and deposits for benefit of plan sponsors, participants and beneficiaries in those plans serviced by J D. Benefits, Inc where Harrington Wealth Management Corporation is the Plan Trustee

First Am. Compl ¶ 14, Ex A

The Dispute Leading to this Lawsuit

As to each EMPO-related plan, the employer-sponsor funded the plan with an "Individual Deferred Retirement Annuity Contract" issued by a division or affiliate of ING North America Insurance Company ("ING") First Am Compl ¶ 15 As trustee of each plan, Harrington Wealth owned the contract, maintaining full title and control

-4-

for the benefit of plan participants. First Am. Compl ¶ 15 In encouraging its clients to establish a defined-contribution 401(k) retirement plan funded by an ING annuity contract, EMPO assured each client that EMPO would pay, or arrange for ING to pay, for all of JDB's fees for administrative services. First Am. Compl ¶ 16 Until early 2003, EMPO or ING paid JDB's fees for services rendered to each plan on behalf of the plan sponsor and trustee Harrington Wealth and also paid Harrington Wealth's fees for its direct services as trustee First Am Compl ¶ 17 Harrington Wealth was ultimately responsible, however, for compensating JDB for the services it provided for, and on behalf of, Harrington Wealth.

In late 2002 or early 2003, a dispute arose between EMPO and ING First Am Compl ¶ 18 The dispute centered around EMPO's claim that ING had waived all deferred sales charges, or surrender charges, associated with annuity contracts funding the defined contribution 401(k) retirement plans of EMPO clients–a claim that ING denied First Am Compl ¶ 18 Beginning on or around November 2002, ING refused to issue annuity contracts to any newly established plan sponsored by an EMPO client In or around February 2003, EMPO announced its intent to establish a multiple-employer plan funded with investment instruments of, and administered by, Transamerica Retirement Services ("Transamerica"). First Am Compl ¶ 19 EMPO would sponsor the plan, and one of EMPO's employees would serve as trustee of the plan EMPO thereafter encouraged its employer-clients to roll its defined-benefit plan into, and to transfer plan assets to, the newly established multiple-employer plan administered by Transamerica. First Am Compl ¶ 20.

-5-

EMPO assured employer-sponsors that the transition would not involve charges to them or plan assets  First Am  Compl ¶ 22.

Plaintiffs became concerned that plan sponsors were receiving incomplete and inaccurate information regarding the proposed plan transfers  First Am Compl ¶ 21. To ensure that no plan sponsor or participant could later claim that JDB or Harrington Wealth had failed to satisfy legal duties to the sponsors or participants, Batchelor offered to meet individually with each employer-sponsor to explain their options  First Am  Compl. ¶ 21   JDB also wrote to each employer-sponsor regarding options and considerations pertinent to a decision to terminate or amend a sponsor's plan  In the meetings and written communications, Plaintiffs advised each employer-sponsor to obtain independent advice from their corporate counsel and/or tax advisor.  First Am  Compl. ¶ 21

EMPO assured employer-sponsors that the transition would not involve charges to them or plan assets.  JDB asked ING whether it was planning to assess deferred sales charges upon liquidation of the annuity contracts funding each plan and whether ING would also pay for the administrative services necessary to transfer asset proceeds to Transamerica   ING informed JDB that, consistent with the terms of the annuity contracts, ING would assess deferred sales charges and furthermore that it would not pay for administrative services associated with terminating the contracts and transferring plan assets to Transamerica.  First Am  Compl ¶ 22   In their meetings and correspondence with plan sponsors, Plaintiffs alerted the sponsors that transition from current plans to the Transamerica plan would involve

-6-

deferred sales charges by ING and fees for the special record-keeping and administrative services required to terminate or amend the plans and transfer assets First Am Compl ¶ 23 Plaintiffs allege that their meetings and communications with employer-sponsors of the EMPO-related plans were within the scope of their authority and responsibility as agents of, and undertaken with the knowledge and approval of, Harrington Wealth

EMPO's Lawsuit against Plaintiffs

On March 11, 2003, EMPO commenced a legal action against Plaintiffs in the District Court for the Fourth Judicial District of the State of Minnesota, alleging that Plaintiffs were interfering with EMPO's contractual relations with its employer-clients, engaging in tortious misconduct, and breaching fiduciary obligations to EMPO First Am. Compl. ¶ 25. EMPO moved the court for a temporary injunction prohibiting Plaintiffs from any further communication with the employer-sponsors of the plans Plaintiffs removed the action to federal court and successfully defended First Am. Compl. ¶ 25 On May 9, 2003, EMPO moved to dismiss the action without prejudice On June 26, 2003, the court entered an order conditionally granting the requested dismissal, with the condition being EMPO's payment of $15,321.33 to counsel for Plaintiffs by July 24, 2003. First Am. Compl ¶ 26

Harrington Wealth's Instructions to and Authorization of Plaintiffs as to Transition Services and Fees

On or about April 14, 2003, Harrington Wealth advised Plaintiffs that the

employer-sponsors of 52 of the EMPO-related plans were removing Harrington Wealth as plan trustee effective May 14, 2003 First Am. Compl ¶ 27 Harrington Wealth directed Plaintiffs to place Harrington Wealth in a position to transfer the assets of each plan on May 14, 2003, per the instructions of the plan sponsor. First Am. Compl. ¶ 27. Sometime after April 14, 2003, Harrison traveled to North Carolina and met with Batchelor at JDB's office in Chapel Hill. First Am Compl ¶ 28 Batchelor informed Harrison of the services that JDB would have to perform for each plan to place Harrington Wealth in a position to effectuate transfer First Am Compl ¶ 28 Harrison authorized and instructed JDB to provide all services necessary and appropriate to permit a smooth transfer of each plan's assets from ING to Transamerica in accordance with employer-sponsor's instructions, and to charge JDB's fees for such services against plan assets unless paid by the employer before asset transfer First Am Compl ¶ 29 In connection with such authorizations and instructions, Harrison reviewed JDB's listings of the services to be provided for each plan and reviewed statements of the fees to be charged by JDB First Am. Compl ¶ 29 Harrison approved the services and fees as necessary, appropriate, and reasonable According to Plaintiffs, these services benefitted Harrington Wealth by fulfilling Harrington Wealth's obligations as trustee of each plan and by effectuating transfer of the plan assets in accordance with Harrington Wealth's commitment to do so First Am Compl. ¶ 29

On or about April 24, 2003, with Harrison's knowledge and approval, JDB

advised each of the 52 employer-sponsors in writing that JDB would proceed in accordance with the employer-sponsor's instructions to the trustee, and that, in accordance with plan documents, the transfer of plan assets (with the requested records and information) would occur on May 14, 2003. First Am. Compl ¶ 30. JDB further explained all services to be performed by it in connection with the transfer and set forth JDB's fees for each service  JDB further explained that the fees would be charged against plan assets unless paid by or on behalf of the employer by May 8, 2003. None of the employer-sponsors made any payment of or toward the fees listed by JDB, and none of the employer-sponsors altered their instructions for transfer of assets  First Am  Compl ¶ 31

By letter dated April 25, 2003, to Harrington Wealth, EMPO's counsel requested that Harrington Wealth provide the authority for ING's assessment of deferred sales charges and for JDB's charging of administrative fees against the plan  EMPO's counsel also asked Harrington Wealth to prevent ING or JDB from deducting any amounts from the plan  First Am  Compl ¶ 32  Harrington Wealth responded by referring EMPO's counsel to the ING Prospectus and to plan documents  First Am  Compl ¶ 33. Harrington Wealth continued to authorize Plaintiffs to provide all services necessary and appropriate to complete transfer of assets by May 14, 2003, in accordance with each plan sponsor's instructions, and to deduct JDB's fees for those services from plan assets. First Am  Compl ¶ 33.

Plaintiffs allege that in reasonable reliance upon the continued instructions

and authorizations of Harrington Wealth, and proceeding in accordance with the express written instructions of each employer-sponsor, JDB provided the record-keeping and transition services necessary for the transfer of assets to Transamerica and deducted fees for JDB's services from proceeds of each ING annuity contract (less the deferred sales charges assessed and retained by ING) First Am. Compl ¶ 34 JDB deposited all remaining funds in a trust account pending transfer on May 14, 2003 Plaintiffs allege that Harrington Wealth, in its role as trustee, expressly authorized and benefitted from these services. First Am. Compl. ¶ 35.

By a faxed letter dated May 9, 2003, from Harrington Wealth's counsel to JDB, Harrington Wealth withdrew its authorization for JDB to charge transition-related service fees against plan assets First Am Compl ¶ 35 Harrington Wealth acknowledged the need for, the quality of, and the value of JDB's services, but nevertheless requested that JDB restore all service fees previously charged against plan assets "pending an agreed upon (or judicial) resolution" of EMPO's challenges First Am Compl ¶ 35 Plaintiffs responded by declaring that they had already performed the services and had properly charged the plans in accordance with Harrington Wealth's instructions and authorizations. First Am. Compl ¶ 36 Plaintiffs stated that they would replace the fees only pursuant to an express instruction of Harrington Wealth accompanied by Harrington Wealth's own payment for the services. Harrington Wealth provided neither the instructions nor payment for Plaintiffs' services First Am Compl ¶ 36.

On May 14, 2003, Plaintiffs delivered 48 checks to Harrington Wealth, each representing the net proceeds of the ING contract funding one of the plans First Am Compl ¶ 37 Plaintiffs also delivered to Harrington Wealth the records and work product produced by Plaintiffs as Harrington Wealth's agents Harrington Wealth forwarded the checks and work product to the successor trustee of each plan in order to relieve Harrington Wealth of any further obligation or risk as trustee. On May 14, 2003, Harrington Wealth forwarded to Plaintiffs written instructions from three additional plan sponsors to liquidate their ING plan assets and to transfer proceeds to Transamerica First Am Compl ¶ 38 Plaintiffs informed Harrington Wealth that JDB would comply but that JDB would invoice Harrington Wealth for their services First Am Compl ¶ 38 Plaintiffs complied with Harrington Wealth's instructions and forwarded to Harrington Wealth checks and work product relating to these plans First Am Compl. ¶ 39. Again, Harrington Wealth accepted the checks and work product and forwarded them to the successor trustee Plaintiffs allege that, once again, Harrington Wealth received a benefit from these services and committed to pay for them

<u>Involvement of the Minnesota Attorney General and a Mediated Settlement in which Harrington Wealth Refused to Participate</u>

On May 29, 2003, the Minnesota Attorney General wrote to ING and JDB to demand, under threat of legal proceedings, that ING reverse deferred sale charges assessed against the EMPO-related annuities and that JDB replace the charges

-11-

against plan assets for service fees First Am Compl. ¶ 40. In written submissions and again at a meeting on June 13, 2003, at the office of the Minnesota Attorney General–attended by the Attorney General, EMPO, some plan sponsors, Plaintiffs, and representatives of ING–ING and JDB documented to the Attorney General that his demands were grounded in an incomplete and inaccurate understanding of the facts First Am Compl ¶ 40 At the conclusion of the June 13 meeting, the Minnesota Attorney General pressed for the attending parties (and others) to mediate with the aim of achieving a settlement under which participants in the EMPO-related plans would be made whole. First Am Compl. ¶ 41. On July 2, 2003, ING, JDB, EMPO, and others participated in a mediation. Harrington Wealth did not attend First Am Compl. ¶ 42 After JDB's departure from the mediation session, ING, EMPO, a principal of EMPO, and the sales agent who had received commissions on annuity sales to the EMPO-related plans reached a settlement, subject to JDB's participation in the settlement and JDB's agreement to certain proposed concessions and commitments First Am Compl ¶ 43. When asked to participate, JDB contacted Harrington Wealth and requested that Harrington Wealth also participate in and contribute to the settlement, but Harrington Wealth refused. First Am Compl ¶ 44 Therefore, Harrington Wealth also proceeded to disclaim any interest in, and instructed JDB to refund, amounts charged to the plans in March 2003 as trustee fees JDB complied First Am Compl ¶ 45 Plaintiffs assert that they were forced to grant further concessions under the mediated settlement,

-12-

including "forbearance of over $15,000, provided certain services without charge, and incurred substantial attorneys' fees." First Am. Compl. ¶¶ 46, 47. Plaintiffs allege that they sustained these additional losses as a result of Harrington Wealth's conduct. First Am. Compl ¶ 47. Finally, Plaintiffs allege that they have invoiced Harrington Wealth for uncollected fees for those services that Harrington Wealth authorized and instructed JDB to provide and for attorneys' fees and costs incurred by Plaintiffs in the litigation against them for services rendered while acting as Harrington Wealth's representatives, but that Harrington Wealth has refused to pay them First Am. Compl. ¶ 50.

Plaintiffs seek to recover what they say Harrington Wealth owes them for services rendered under the parties' contract, under a quantum meruit theory, and under promissory estoppel. Plaintiffs also seek indemnification against Harrington Wealth for legal costs incurred in EMPO's lawsuit against JDB and the Minnesota Attorney General's threatened legal action. Plaintiffs seek judgment against Harrington Wealth of approximately $200,000. Defendant has moved for judgment on the pleadings as to Plaintiffs' claims for promissory estoppel and indemnification [2]

---

[2] Plaintiffs contend that the court should not consider the motion for judgment on the pleadings because Defendant failed to give its notice of intent to file a dispositive motion within ten days of the close of discovery as required by this court's Local Rule 56 1(a) and because Defendant did not bring its motion "promptly" in accordance with the spirit of Rule 12(c), which requires a party to move for judgment on the pleadings after the pleadings are closed but within such time as not to delay the trial Local Rule 56 1, titled "Summary Judgment Motions," requires a party who intends to file a motion for summary judgment, or any other dispositive motion, to file and serve notice of the intent to do so within ten days of the close of the discovery period LR 56 1(a)

-13-

## DISCUSSION

### Motion for Judgment on the Pleadings

Rule 12(c) of the Federal Rules of Civil Procedure provides as follows:

After the pleadings are closed but within such time as not to delay the trial, any party may move for judgment on the pleadings If, on a motion for judgment on the pleadings, matters outside the pleadings are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56, and all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by Rule 56

Motions for judgment on the pleadings are subject to the same standard as Rule 12(b)(6) motions to dismiss Viewing all of the facts in a light most favorable to the non-moving party, the court may only grant the motion if it is beyond doubt that the non-movant can plead no facts that would support his claim for relief Unless the circumstances permit consideration of the motion as a motion for summary judgment, the court is limited to considering the pleadings taking all uncontested allegations as true. The court may also consider documents attached to and made part of the pleadings by reference as allowed by Rule 10(c) of the Federal Rules of Civil Procedure and judicial notice of matters of public record *See United States v.*

---

Consistent with the spirit of Rule 12(c), Local Rule 56 1 further allows the court to address a dispositive motion filed in an untimely manner if its conclusion will not cause delay to the proceedings LR 56 1(g) Here, the discovery period ended on February 15, 2005, and Defendant filed its motion for judgment on the pleadings on March 14, 2005 The motion for judgment on the pleadings was filed before the deadline for filing dispositive motions Furthermore, the court finds that a ruling on the motion for judgment on the pleadings will not delay trial and will further streamline the litigation Thus, the court in its discretion will address the motion

-14-

*Wood*, 925 F.2d 1580, 1582 (7th Cir 1991).

Plaintiffs' Claim for Promissory Estoppel

The court first considers Defendant's motion for judgment on the pleadings as to Plaintiffs' claim for promissory estoppel. Here, Plaintiffs are attempting to use the doctrine of promissory estoppel as an affirmative claim against Defendant. The North Carolina courts have applied the doctrine of promissory estoppel when it has been raised defensively as a shield against a claim by one who, in bringing suit, is essentially reneging on a promise not to do so. The North Carolina courts have expressly disallowed the doctrine of promissory estoppel, however, as a substitute for traditional notions of consideration when raised affirmatively by one seeking to prove the existence of a contract as the basis of recovery. *See Dealers Supply Co. v Cheil Indus., Inc*, 348 F. Supp. 2d 579, 590 (M.D.N.C 2004) (discussing the North Carolina courts' rejection of promissory estoppel as an affirmative claim), *Home Elec. Co of Lenoir, Inc. v Hall & Underdown Heating & Air Conditioning Co.*, 86 N.C. App 540, 543, 358 S.E.2d 539, 541 (1987). Thus, the court should grant Defendant's motion for judgment on the pleadings as to this claim.

Plaintiffs' Claim for Indemnification

The court next considers Defendant's motion for judgment on the pleadings as to Plaintiffs' indemnification claim. Here, Plaintiffs seek indemnification from Defendant by virtue of the parties' alleged agent/principal relationship. Plaintiffs allege that the parties had an agreement under which Plaintiffs acted as Harrington

-15-

Wealth's agent in providing services to third parties in Harrington Wealth's role as trustee for various employee benefit plans  Under the common law of agency, as set forth in the RESTATEMENT (SECOND) OF AGENCY § 438(2)(b) (1958), an agent is entitled to indemnification from the principal for losses incurred in performance of the agency that, because of the parties' relationship, should fairly be borne by the principal.  *See, e g , Fidelity Mortgage Trustee Serv., Inc v Ridgegate East Homeowners Ass'n*, 27 Cal  App  4th 503, 32 Cal  Rptr  2d 521 (1994), *Southern Farm Bureau Cas. Ins. Co v Gooding*, 263 Ark  435, 565 S.W 2d 421 (1978)  More specifically, section 439 of the RESTATEMENT (SECOND) OF AGENCY defines the scope of this common law duty as follows.

> Unless otherwise agreed, a principal is subject to a duty to exonerate an agent who is not barred by the illegality of his conduct to indemnify him for:
> (a) authorized payments made by the agent on behalf of the principal;
> (b) payments upon contracts upon which the agent is authorized to make himself liable, and upon obligations arising from the possession or ownership of things which he is authorized to hold on account of the principal,
> (c) payments of damages to third persons which he is required to make on account of the authorized performance of an act which constitutes a tort or a breach of contract;
> (d) expenses of defending actions by third persons brought because of the agent's authorized conduct, such actions being unfounded but not brought in bad faith, and
> (e) payments resulting in benefit to the principal, made by the agent under such circumstances that it would be inequitable for indemnity not to be made

The comment to RESTATEMENT (SECOND) OF AGENCY § 439 further explains·

> An agent who has done an authorized act which brings him into contact

-16-

> with others . . . is ordinarily entitled to indemnity for the expenses of a successful defense to actions brought by third persons acting under the mistaken belief that the agent's conduct was a breach of contract, a tort, or otherwise created liability to them

RESTATEMENT (SECOND) OF AGENCY § 439(d) cmt h *See also Basmajian v Christie, Manson & Woods Int'l, Inc.*, 629 F Supp. 995, 998-99 (S D N.Y 1986) ("Where an agent defends a suit arising out of business properly conducted on the principal's behalf, it is black-letter law that the agent is entitled to indemnification of its legal fees ") Although the case law is scant, it appears that North Carolina follows this common law rule. *See, e g , Hunter v Jameson*, 28 N.C. 252 (1 Ired.), 1846 WL 1016 (1846) For instance, in *Hunter v Jameson*, the parties shared an agent/principal relationship whereby the plaintiff sold clocks as the defendant's agent The plaintiff sold a clock with a warranty, and the buyer of the clock later sued the plaintiff for breach of the warranty A judgment was obtained against the plaintiff, which he paid The plaintiff then sued the defendant to recover the amount of the judgment and the costs The North Carolina Supreme Court held that because of the parties' agency relationship, the plaintiff could recover from the defendant for the damages and costs in defending the suit. The court stated·

> When an agent is appointed to sell articles of personal property, the law implies that he has a right to warrant their soundness, in behalf of his principal. If he sells the articles with such a warranty as binds him personally, and damages are recovered against him upon the warranty by the purchaser, he has a right to be reimbursed by his principal to the amount of such damages, as well as of the necessary costs incurred in defending the suit

-17-

*Id*

Here, according to Plaintiffs' allegations, which the court must take as true for the purpose of Defendant's motion, in contacting sponsors of EMPO-related plans to advise them of their options, Plaintiffs were performing within the scope of their authority as agents and representatives of Defendant as trustee of each such plan. Furthermore, in performing transition-related services for the EMPO-related plans and deducting service fees from plan assets, Plaintiffs were acting within the scope of their authority as agents and representatives of Defendant and with the express approval of Defendant. By reason of their authorized conduct as agents and representatives of Defendant, Plaintiffs were forced to defend themselves in and against EMPO's legal action and to defend against demands and threatened action by Minnesota's Attorney General. Plaintiffs allege that Defendant is obligated to indemnify them for their attorneys' fees, other costs and expenses, and the value of all services, payments, or concessions made in connection with defending against EMPO's action, in responding to the Minnesota Attorney General, and in participating in the mediated settlement. The court finds that Plaintiffs have alleged a claim against Defendant for indemnification sufficient to withstand Defendant's judgment on the pleadings as to this claim.

Defendant contends, however, that, pursuant to North Carolina's Uniform Trusts Act, Defendant may be excluded from personal liability in this case. Section 36A-74(a) of the Act provides

-18-

> Whenever a trustee shall make a contract which is within his powers as trustee, or a predecessor trustee shall have made such a contract, and a cause of action shall arise thereon, the party in whose favor the cause of action has accrued may sue the trustee in his representative capacity, and any judgment rendered, in such action in favor of the plaintiff shall be collectible (by execution) out of the trust property. In such an action the plaintiff need not prove that the trustee could have secured reimbursement from the trust fund if he had paid the plaintiff's claim

N C. GEN STAT § 36A-74(a)   Furthermore, section 36A-74(c) provides:

> The plaintiff may also hold the trustee who made the contract personally liable on such contract, if the contract does not exclude such personal liability  The addition of the word "trustee" or the words "as trustee" after the signature of a trustee to a contract shall be deemed prima facie evidence of an intent to exclude the trustee from personal liability

Defendant argues Plaintiffs have admitted that there was "an intent to exclude the trustee from personal liability" on any claims arising from the parties' agency relationship and, thus, under the language of section 36A-74(c), Defendant cannot be held personally liable on Plaintiffs' indemnification claim. The court finds that, to the extent that sections 36A-74(a) and (c) apply to the parties' alleged agency relationship in this case, Plaintiffs have not, as Defendant claims, exhibited an intent to exclude Defendant from personal liability. In sum, Plaintiffs have stated a claim for indemnification under a common law theory of agency sufficient to defeat Defendant's motion for judgment on the pleadings

## CONCLUSION

Based on the foregoing, **IT IS RECOMMENDED** that Defendant's motion for

-19-

judgment of the pleadings be **GRANTED IN PART** in that Plaintiffs' promissory estoppel claim should be dismissed [docket no. 39] The court should **DENY** Defendant's motion for judgment on the pleadings, however, as to Plaintiffs' indemnification claim. Finally, as for Defendant's amended motion [docket no 42] for reconsideration of the court's denial of Defendant's previous motion for an extension of deadlines, the motion for reconsideration is **DENIED** for the same reasons stated in the court's order of March 15, 2005, [docket no 41] denying Defendant's first motion for reconsideration [docket no 38]

_____
WALLACE W. DIXON
United States Magistrate Judge

Durham, NC
July 11, 2005